1 **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9  J.K., a single woman,                  )    No. CV 06-916-PHX-MHM
                                          )
10              Plaintiff,                 )    **ORDER**
                                          )
11 v.                                     )
                                          )
12 ARIZONA BOARD OF REGENTS, et al.,      )
                                          )
13              Defendants.               )
                                          )
14 _____)

15        Currently before the Court are Defendants Arizona Board of Regents and Arizona

16 State University's (collectively, the "ASU Defendants") motion for summary judgment (Dkt.

17 #162), and Defendant Dirk Koetter's motion for summary judgment (Dkt. #163).  First,

18 Plaintiff J.K. ("J.K.") alleges that the ASU Defendants violated Title IX of the Education

19 Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681 et seq., as a result of their conduct

20 preceding and following her on-campus, student-on-student sexual assault in March 2004.

21 Plaintiff also alleges that Defendant Koetter violated her substantive due process rights under

22 the Fourteenth Amendment.  The ASU Defendants contend that they may not be held liable

23 under Title IX because they were not deliberately indifferent to Plaintiff's sexual assault, and

24 Defendant Koetter contends that he may not be held liable under 42 U.S.C. § 1983 because

25 he is entitled to qualified immunity.  After considering the parties' pleadings and applicable

26 law, and holding oral argument on August 5, 2008, the Court issues the following order.

27

28

## I.      FACTUAL & PROCEDURAL BACKGROUND

In the spring of 2003, Defendant Darnel Henderson ("Henderson") was awarded a full football scholarship to attend Arizona State University ("ASU").  (Plaintiff's Statement of Facts ("PSOF") ¶18).  Henderson enrolled at ASU on June 18, 2003 as a student in ASU's Summer Bridge program, which helps high school students transition to college.  (PSOF 19; Defendant's Statement of Facts ("DSOF") ¶12).  ASU's Department of Residential Life ("Residential Life") operates the dormitories on campus; Residential Life employs Summer Conference Assistants ("SCAs") who are responsible for, among other things, monitoring the behavior of conference participants, including students in the Summer Bridge program. (DSOF ¶¶ 4, 21).

Between June 18 and July 17, 2003, Henderson engaged in repeated acts of misconduct, including *inter alia* bouncing a basketball in his dormitory at all hours of the night, pouring bleach on another student's clothing, physically intimidating and making threatening remarks to female staff members, making inappropriate sexual remarks to females, grabbing and inappropriately touching females, and exposing his genitalia to female staff members.  (PSOF ¶24; DSOF ¶¶ 22-43).  A number of females, including Residential Life employees and SCAs, who worked and/or lived in the dormitory in which Henderson resided, were afraid that Henderson might sexually or physically assault them.  (PSOF ¶¶ 20-25; DSOF ¶¶ 21-30, 44-45).  One female staff member resigned her position as a result of Henderson's conduct, and at least one other female staff member moved out of the dorm for the same reason.  (PSOF ¶¶ 21, 22).

After hearing about incidents involving Henderson, Steve Rippon, ASU's Executive Director of Academic Success and Director of the Summer Bridge program, spoke with Henderson about his behavior, at which time Henderson told Rippon that he wanted women to fear him and he wanted to "show them their place." (PSOF ¶24).  Rippon told Henderson that he would be expelled if he was involved in any more incidents.   (DSOF ¶39). Henderson subsequently poured bleach on another student's clothing; Rippon then expelled Henderson from the Summer Bridge program on July 17, 2003.  (DSOF ¶43).  Henderson

1   returned to Oakland, California. (DSOF ¶¶ 14, 46). That same day, Jean Boyd, an Assistant

2   Athletic Director at ASU's Department of Intercollegiate Athletics ("ICA") who served as

3   liaison between ICA and the Summer Bridge program, sent an email to the football coaching

4   staff, including Defendant Dirk Koetter ("Koetter" or "Coach Koetter"), head coach of the

5   ASU football program, informing them of Henderson's removal. (DSOF ¶46). Henderson

6   was one of only two students, and the only football player, to have ever been kicked out of

7   the Summer Bridge program. (PSOF ¶27). Both Rippon and Koetter were authorized to

8   report Henderson to Judicial Affairs for his misconduct during the Summer Bridge program;

9   they did not report Henderson. (PSOF ¶¶ 44, 46).

10       After his expulsion, the head of ASU Residential Life, Dr. Georgiana Montoya,

11   requested and received all documentation regarding Henderson's misconduct and sexual

12   harassment during the Summer Bridge Program. (Plaintiff's Supplemental Statement of

13   Facts ("PSSOF") ¶17). In addition, before returning to ASU in August 2003, Henderson

14   spoke with Coach Koetter on the phone and in-person about his behavior and whether he

15   would be able to return to ASU and play on the football team. (PSOF ¶¶ 30-31; DSOF ¶53).

16   Henderson stated that Koetter first told him that he might not be able to come back to ASU,

17   and then later told him that he had worked things out so that Henderson could return to ASU

18   and join the football team. (PSOF ¶¶ 31, 33). Henderson's eligibility to participate in the

19   football program and receive his athletic scholarship was pending before the NCAA

20   Clearinghouse during this time. (DSOF ¶48). Before Henderson returned to ASU, Jean

21   Boyd reported that Henderson was "the highest risk individual in the group [of freshman

22   football players] both socially and academically." (DSOF ¶49).

23       Henderson returned to ASU in August 2003 as a student and was allowed to join the

24   ASU football team. (DSOF ¶32). Henderson was placed in the same on-campus dormitory

25   from which he had recently been expelled. (DSOF ¶72). At oral argument, counsel for

26   Defendant Koetter stated that Coach Koetter's policy was to have all freshman football

27   players live in close proximity in the on-campus dormitories; no exception was made for

28   Darnel Henderson. Koetter and other coaches informed Henderson that the football program

1    would have zero tolerance for the kind of behavior that got Henderson kicked out of the

2    Summer Bridge program; it was up to Coach Koetter as to what sort of conduct would get

3    Henderson kicked off the football team.   (DSOF ¶55; PSOF ¶47; PSSOF ¶19).   Indeed,

4    Henderson was supposed to have been able to rejoin the football team subject to a "three

5    strikes" or "zero tolerance" plan, designed by Koetter, and recognized as necessary by the

6    football program.   (PSOF ¶47; PSSSOF ¶19).

7         During the fall of 2003, Henderson received noise complaints (DSOF ¶72), was

8    disruptive in his mathematics course (PSSOF ¶21) and was required to serve Commitment

9    Time for violations within the football program, such as tardiness (DSOF ¶73; PSOF ¶¶ 50-

10   51).   Despite his Summer Bridge misconduct, Henderson received no special supervision,

11   monitoring, mentoring, counseling, or guidance; a zero tolerance plan was never

12   implemented.   (PSOF ¶62, PSSOF ¶¶ 19, 30).   On March 3, 2004, Henderson was written

13   up by ASU officers for drug infractions; Residential Life placed Henderson one a one-year

14   probation.   (PSOF ¶56; DSOF ¶75).

15        In the early hours of March 12, 2004, Henderson allegedly raped Plaintiff J.K. (DSOF

16   ¶¶ 2-3, 99-100).   Henderson and J.K. lived in the same dormitory; they had never met before

17   that night.   (DSOF ¶86).   Later that morning, J.K. told her roommate, who had not spent the

18   night in the room, about the sexual assault; J.K.'s roommate reported the rape to their

19   Resident Assistant ("RA").   (DSOF ¶104).   The RA notified his supervisors in Residential

20   Life, who then notified ASU's Department of Public Safety ("DPS"); DPS dispatched an

21   officer to the scene to begin an criminal investigation into the alleged rape.   (DSOF ¶105).

22   Residential Life also notified Dr. Deborah Sullivan, head of ASU Student Life and Judicial

23   Affairs ("Judicial Affairs"); Dr. Sullivan also began an investigation into the incident.

24   (DSOF ¶106).   Judicial Affairs is the ASU Department that enforces the Student Code of

25   Conduct.

26        On April 2, 2004, Dr. Sullivan issued Henderson a written notice of charges,

27   indicating that there was probable cause to believe that Henderson had violated the Student

28   Code of Conduct.   (DSOF ¶107).   Although Residential Life had the authority to ban

Henderson from ASU dormitories immediately after the report of rape (PSSOF ¶78), Henderson was not asked to move out of his dormitory until April 2, 2004; he was also suspended from the football program at that time. (DSOF ¶¶ 108-09). Defendant Koetter subsequently arranged for Henderson to move in and live with other football players. (PSSOF ¶83).

On May 10, 2004, after concluding that Henderson had more likely than not sexually assaulted J.K. in violation of the Student Code of Conduct, Dr. Sullivan expelled Henderson from ASU. (DSOF ¶¶ 110-12). Until that time, Henderson had been allowed to remain at ASU to complete his spring 2004 semester. (PSSOF ¶74). In addition, DPS's formal investigation concluded that Henderson had non-consensual sexual intercourse with J.K. and that there was probable cause for a criminal prosecution.[1] (PSOF ¶67). In May 25, 2004, Assistant Athletic Director Boyd wrote an email to Coach Koetter stating that he believed that ICA and the football program had failed to act in response to the "character" that Henderson had displayed during the Summer Bridge program. (PSSOF ¶111).

On March 10, 2006, Plaintiff filed the instant complaint in the Maricopa County Superior Court. (PSOF ¶69(18); Dkt. #1). Defendants removed the case to the United States District Court for the District of Arizona on March 29, 2006. (Dkt. #1).

On October 3, 2007, Plaintiff filed a motion for default or partial summary judgment and sanctions for ASU's willful destruction of documentation regarding *inter alia* Henderson's misconduct during the Summer Bridge program. (Dkt. #155). On October 5, 2007, the ASU Defendants filed a motion for summary judgment. (Dkt. #162). Defendants Rippon and Koetter followed suit and filed motions for summary judgment on October 6, 2007. (Dkt. #s 163, 164). On August 5, 2008, counsel for Plaintiff and the ASU Defendants,

---

[1]Although the Maricopa County Attorney later declined to prosecute Henderson for the alleged rape (DSOF ¶118), ASU does not contest J.K.'s allegation that Henderson raped her, and ASU's DPS investigation concluded that Henderson had non-consensual sexual intercourse with J.K. (DSOF ¶110, PSOF ¶67). As such, for purposes of this order, the Court will refer to the March 13, 2004 incident between Henderson and J.K. as "rape" or "sexual assault," rather than "alleged rape" or "alleged sexual assault."

1   Rippon, and Koetter, stated on the record that they were going to dismiss Steve Rippon as
2   a named defendant in this action.

3          On March 3, 2008, the Court granted a request to file an amicus curiae brief in support
4   of J.K.'s opposition to the ASU Defendants' motion for summary judgment by the American
5   Civil Liberties Union Foundation, American Civil Liberties Union Foundation of Arizona,
6   California Women's Law Center, Connecticut Women's Education and Legal Fund, Legal
7   Momentum, National Women's Law Center, Sargent Shriver National Center on Poverty
8   Law, and Women's Law Project.  (Dkt. #220).

9   **II.   LEGAL STANDARD ON SUMMARY JUDGMENT**

10         A motion for summary judgment may be granted only if the evidence shows "that
11  there is no genuine issue as to any material fact and that the moving party is entitled to
12  judgment as a matter of law." Fed.R.Civ.P. 56(c).  The purpose of summary judgment is to
13  identify and dispose of factually unsupported claims. See Celotex Corp. v. Cattrett, 477 U.S.
14  317, 323-24 (1986).  "A party moving for summary judgment who does not have the ultimate
15  burden of persuasion at trial, must produce evidence which either negates an essential
16  element of the non-moving party's claims or show that the non-moving party does not have
17  enough evidence of an essential element to carry its ultimate burden of persuasion at trial."
18  Visa U.S.A., Inc. v. First Data Corp., 2006 WL 516662 at *1 (N.D.Cal. 2006) (citing Nissan
19  Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000)).  To defeat a
20  motion for summary judgment, the non-moving party must show that there are genuine
21  factual issues "that properly can be resolved only by a finder of fact because they may
22  reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S.
23  242, 250 (1986).  The non-moving party "may not rest upon the mere allegations or denials
24  of [the party's] pleadings, but ... must set forth specific facts showing that there is a genuine
25  issue for trial." Fed.R.Civ.P. 56(e); see also Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.
26  1996) (the nonmoving party must "identify with reasonable particularity the evidence that
27  precludes summary judgment").

28

1    The evidence in the record must be viewed in the light most favorable to the non-

2  moving party.  Devereaux v. Abbey, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc); see also

3  Freeman v. Arpaio, 125 F.3d 723, 735 (9th Cir. 1997) ("In considering a motion for summary

4  judgment, the court may not weigh the evidence or make credibility determinations, and is

5  required to draw all inferences in a light most favorable to the non-moving party."); but see

6  Barnes v. Arden Mayfair, Inc., 759 F.2d 676, 680 (9th Cir. 1985) ("A party opposing

7  summary judgment is entitled to the benefit of only reasonable inferences that may be drawn

8  from the evidence put forth.").  "At the summary judgment stage, we do not focus on the

9  admissibility of the evidence's form. We instead focus on the admissibility of its contents."

10  Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) (citing Fed. Deposit Ins. Corp. v.

11  N.H. Ins. Co., 953 F.2d 478, 485 (9th Cir. 1991) ("[T]he non-moving party need not produce

12  evidence in a form that would be admissible at trial in order to avoid summary judgment.")).

13  **III.    DIRK KOETTER'S MOTION FOR SUMMARY JUDGMENT**

14    Defendant Dirk Koetter ("Koetter" or "Coach Koetter") moves the Court for summary

15  judgment on J.K.'s Section 1983 claim for violation of her right to substantive due process

16  as guaranteed by the Fourteenth Amendment.  (Dkt. #163).  Koetter contends that he is

17  entitled to qualified immunity, that he did not violate J.K.'s constitutional rights, in the

18  alternative that the rights violated were not clearly established, and his actions were

19  reasonable.  In addition, Koetter contends that J.K.'s injury was not foreseeable.

20    Section 1983 provides a private right of action for damages to individuals who are

21  deprived of "any rights, privileges, or immunities" protected by the U.S. Constitution or

22  federal law by any person acting under the color of state law.  42 U.S.C. § 1983.  As such,

23  state officials may be held liable under Section 1983 if there is, at minimum, an underlying

24  constitutional tort.  Johnson v. City of Seattle, 474 F.3d 634, 638-39 (9th Cir. 2007) (citing

25  Monell v. Dep't of Soc. Serv. of the City of New York, 436 U.S. 658, 691 (1978)).  However,

26  the defense of qualified immunity generally shields officials in the performance of their

27  discretionary duties from liability for civil damages "insofar as their conduct does not violate

28

1  clearly established statutory or constitutional rights of which a reasonable person would have
2  known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

3        When qualified immunity is pled, the Court must first determine whether the facts
4  taken in the light most favorable to the plaintiff show that the official's conduct violated a
5  constitutional right.  Kennedy v. City of Ridgefield, 439 F.3d 1055, 1060 (9th Cir. 2006)
6  (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)); Brittain v. Hansen, 451 F.3d 982, 988
7  (9th Cir. 2006).  If the Court determines that the official's conduct does not amount to a
8  constitutional violation, then the inquiry is over and the official is entitled to qualified
9  immunity. Id.  However, "if a violation could be made out on a favorable view of the parties'
10  submissions, [then] the sequential step is to ask whether the right was clearly established"
11  at the time of the violation.  Saucier, 533 U.S. at 201.  "A right is clearly established if its
12  'contours' are 'sufficiently clear that a reasonable official would understand that what he is
13  doing violates that right.'"  Kennedy, 439 F.3d at 1060-61 (quoting Saucier, 533 U.S. at
14  202); compare Malley v. Briggs, 475 U.S. 335, 341 (1986) ("Defendants will not be immune
15  if, on an objective basis, it is obvious that no reasonably competent officer would have
16  concluded that a warrant should issue.") with Saucier, 533 U.S. at 205 (if "the officer's
17  mistake as to what the law requires is reasonable, . . . the officer is entitled to the immunity
18  defense"); see Rudebusch v. Hughes, 313 F.3d 506, 514 (9th Cir. 2002) (qualified immunity
19  allows ample room for reasonable error on the part of the official and encompasses both
20  mistakes of fact and mistakes of law).

21      **A.  Did Koetter Violate Plaintiff's Constitutional Rights?**

22        "It is well established that the Constitution protects a citizen's liberty interest in her
23  own bodily security."  Kennedy, 439 F.3d at 1061 (citations omitted).  It is also well
24  established that "a State's failure to protect an individual against private violence simply does
25  not constitute a violation of the Due Process Clause."  DeShaney v. Winnebago County Dep't
26  of Social Services, 489 U.S. 189, 179 (1989).  However, state officials may nevertheless be
27  held liable "for their roles in creating or exposing individuals to danger that they otherwise
28  would not have faced."  Kennedy, 439 F.3d at 1062.  Accordingly, "although the state's

1   failure to protect an individual against private violence does not generally violate the
2   guarantee of due process, it can where the state action 'affirmatively place[s] the plaintiff in
3   a position of danger,' that is, where state action creates or exposes an individual to a danger
4   which he or she would not have otherwise faced." Id. at 1061 (quoting DeShaney, 489 U.S.
5   at 197, 201).

6       The "state-created danger" exception clearly establishes that "state actors may be held
7   liable where they affirmatively place an individual in danger by acting with deliberate
8   indifference to [a] known or obvious danger in subjecting the plaintiff to it." Id. (quotations
9   omitted).  As such, "there are two elements in deciding whether the state-created danger
10  exception applies: 1) danger affirmatively created due to state action and 2) the state official's
11  deliberate indifference to a known or obvious danger."   Tobin v. Washington, 2007 WL
12  3275073, at *5 (W.D.Wash. 2007).

13              **i.  Danger Affirmatively Created Due to State Action**

14      To determine whether a state actor affirmatively placed an individual in danger, the
15  Court must examine "whether the officer left the person in a situation that was more
16  dangerous than the one in which [he or she] found him." Munger v. City of Glasgow, 227
17  F.3d 1082, 1086 (9th Cir. 2000).  If there is no "involuntary exposure to harm as a result of
18  a state actor's command," then there is no affirmative state action.  Tobin, 2007 WL
19  3275073, at *5.  In other words, a state actor cannot affirmatively place an individual in
20  danger merely by failing to act, regardless of how reprehensible that failure may be;
21  substantive due process is violated only when a state actor engages in affirmative conduct
22  that enhances the danger to which an individual, or discrete and clearly identifiable class of
23  individuals, is exposed.  See, e.g., Johnson, 474 F.3d at 641; Kennedy, 439 F.3d at 1057-58;
24  Munger, 227 F.3d at 1084; Penilla v. City of Huntington Park, 115 F.3d 707, 708, 711 (9th
25  Cir. 1997); L.W. v. Grubbs, 974 F.2d 119, 122 (9th Cir. 1992); Wood v. Ostrander, 879 F.2d
26  583, 589-90 (9th Cir. 1989).  Thus, the Court must ask whether, as alleged, any affirmative
27  actions by Coach Koetter placed J.K. in danger that she otherwise would not have faced.
28

1    Interpreting the facts in a manner most favorable to J.K., the Court concludes that there are

2    genuine issues of material fact as to whether Koetter did.

3        Defendant Koetter argues that he can not be held liable under the state-created danger

4    exception because Plaintiff "offers no evidence that [he] performed any affirmative act to put

5    Plaintiff in danger, and instead accuses him only of inaction." (Dkt. #192, p.1). In response,

6    Plaintiff alleges that "[t]he facts demonstrate that Koetter used his authority as a state official

7    to create an opportunity for Henderson to assault Plaintiff that would not have otherwise

8    existed." (Dkt. #182, p.11). Specifically, Plaintiff contends that "[b]ut for: a) Koetter's

9    knowledge of Henderson's predatory sexual harassment and threatening behavior, b) his

10   affirmative actions in facilitating and permitting Henderson to return to ASU in August 2003

11   after already being expelled from Summer Bridge for sexual harassment, c) his affirmative

12   action in concealing relevant information from Clubb and Sullivan at Student Affairs, and

13   d) his affirmative action in not enforcing his 'three strikes/zero tolerance" policy but in

14   assisting Henderson in dealing with investigations into his drug violations just days before

15   the rape of Plaintiff, Plaintiff would not have remained in harm's way and been raped in her

16   dormitory room." (Dkt. #182, p.12).

17       Plaintiff recognizes that "the key issue focused upon [is] whether the plaintiff offered

18   evidence that a defendant engaged in affirmative conduct that enhanced the danger to the

19   plaintiff." (Id., p.10 n. 4). Nonetheless, Plaintiff refers to Koetter's "omissions and

20   commissions" as a basis on which to hold Koetter liable under the state-created danger

21   exception. (Id., pp. 11-12). Specifically, Plaintiff attempts to mold Koetter's *failure to*

22   *report* Henderson's condut to Judicial Affairs and Koetter's *failure to enforce* a "zero

23   tolerance" or "three-strikes" plan into affirmative conduct that placed Plaintiff in a position

24   of danger. None of the cases dealing with the state-created danger exception establish such

25   a malleable interpretation of "affirmative conduct."

26       As previously stated, a state actor's failure to protect an individual against private

27   violence can violate the guarantee of due process only where the actor's conduct

28   *affirmatively places* the plaintiff in a position of danger. See Kennedy, 439 F.3d at 1061.

1    A state actor may only be held to have affirmatively placed a plaintiff in a position of danger

2    by virtue of "omissions and commissions" to the extent that the actor's failure to act is

3    coupled with some sort of affirmative conduct.  See Grubbs, 974 F.2d at 122 (finding that

4    the plaintiff's supervisors affirmatively placed her in a position of danger when they assigned

5    her to work with a violent sex offender, despite having assured her that would not do so);

6    Kennedy, 439 F.3d at 1063 (finding that a police officer placed the plaintiff in a position of

7    danger when he assured her that he would notify her prior to contacting the neighbor's family

8    about her allegations that the neighbor had molested the plaintiff's nine-year-old daughter,

9    and then he nonetheless informed the neighbor of the plaintiff's allegations without first

10   notifying her).  The relevant inquiry is whether the state actor "*affirmatively created* an

11   actual, particularized danger [that the plaintiff] would not otherwise have faced." Kennedy,

12   439 F.3d at 1063 (emphasis added).

13        Indeed, Plaintiff's interpretation would have this Court extend the state-created

14   danger exception to subject state actors to liability for non-affirmative conduct, i.e., to subject

15   actors to liability for inaction, which runs directly counter to the Supreme Court's admonition

16   in DeShaney that *failure to protect* an individual against private violence, i.e., inaction, does

17   not constitute a violation of the Due Process Clause.  489 U.S. at 197; see also Stevens v.

18   Umsted, 131 F.3d 697 (7th Cir. 1997) (emphasizing that the state-created danger theory

19   requires an affirmative act on the part of the state actor, and finding that a superintendent's

20   failure to follow state law and remove or expel perpetrators of sexual assaults did not

21   constitute affirmative action for purposes of the state-created danger exception); D.R. v.

22   Middle Bucks Area Vocational Tech. Sch., 972 F.2d 1364, 1375-76 (3d Cir. 1992) (holding

23   that failure to report abuse as required by state law was insufficient to state a claim under §

24   1983).  Plaintiff cites the Court to no case that supports such an expansive interpretation of

25   the state-created danger exception.  Thus, Koetter's failure to report Henderson's conduct

26   and failure to enforce a behavioral plan can not be said to constitute affirmative conduct,

27   such that Koetter's failure to report or enforce a plan may be said to have "affirmatively

28

1   placed" Plaintiff "in a situation that was more dangerous than the one in which [he] found

2   [her]." Munger, 227 F.3d at 1086.

3          However, Defendant Koetter's actions appear to go beyond the mere failure to act.

4   In addition to alleging that Koetter failed to act, Plaintiff alleges that Koetter "affirmatively

5   insured that Henderson returned to school, where he was assigned to the very dormitory

6   where his acts of sexual harassment against females had occurred just one month earlier."

7   (Dkt. #182, p.12). In response, Coach Koetter contends that Plaintiff's allegation that he

8   facilitated and permitted Henderson's return to ASU in August 2003 is merely an allegation

9   that he did not terminate Henderson's football scholarship, which had been awarded in

10  February 2003, months before the Summer Bridge program. (Dkt. #192, p.4). Specifically,

11  Koetter states that "[t]here is no competent evidence that Koetter took any action *after*

12  Summer Bridge to facilitate Henderson coming to ASU." (Id.).

13         However, the question for the Court on this motion for summary judgment is merely

14  whether there is enough evidence of an essential element for Plaintiff to carry her ultimate

15  burden of persuasion at trial. Indeed, as previously stated, the Court may not weigh the

16  evidence or make credibility determinations, and is required to draw all reasonable inferences

17  in favor of Plaintiff. Freeman, 125 F.3d at 735. As such, the Court must ask whether there

18  is any evidence or reasonable inferences to support Plaintiff's contention that Coach Koetter

19  took some action after Henderson had been kicked out of the Summer Bridge program to

20  facilitate Henderson's return to ASU, i.e., whether there is evidence that Koetter can be

21  found to have "affirmatively created an actual, particularized danger [that the plaintiff] would

22  not otherwise have faced." Kennedy, 439 F.3d at 1063. The Court finds that the evidence

23  in the record does in fact support a reasonable inference that Coach Koetter affirmatively

24  facilitated Henderson's return to ASU after the Summer Bridge program. Thus, at this time,

25  the evidence does not support a finding that Plaintiff can not carry her ultimate burden of

26  persuasion at trial.

27         Specifically, the evidence establishes that Dr. Montoya, the head of Residential Life,

28  requested all of the files on Henderson's conduct after Henderson had been kicked out of the

1    Summer Bridge program, that Coach Koetter initially told Henderson that he might not be
2    able to come back to ASU but then later told Henderson that he had worked things out so that
3    Henderson could return, and that after the Summer Bridge program and prior to Henderson's
4    return, Koetter and the other football coaches stated that Henderson would be subject to a
5    "three strikes" or "zero tolerance" plan when he returned to ASU.  Those facts are sufficient
6    to draw a reasonable inference that ASU was going to take action against Henderson after
7    he had been kicked out of the Summer Bridge program, and that as a result Coach Koetter
8    offered to place Henderson on a "three strikes" or "zero tolerance" plan so that Henderson
9    could return to ASU and rejoin the football team.  In addition, Koetter had a policy of placing
10   freshman football players in the dormitories, and Henderson was placed in the dormitories
11   pursuant to that policy without any restrictions.  Koetter also assisted Henderson in obtaining
12   housing with other football players when Henderson left his dormitory three weeks after he
13   sexually assaulted J.K.

14          Those facts, and the reasonable inferences drawn from the totality of the
15   circumstances, support a finding that Plaintiff may be able to carry her ultimate burden of
16   persuasion at trial with respect to whether Coach Koetter affirmatively acted to facilitate
17   Henderson's return to ASU after he had been kicked out of the Summer Bridge program.
18   That evidence, and inferences drawn therefrom, can reasonably be said to support Plaintiff's
19   contention that Koetter's conduct constituted affirmative action.  Accordingly, viewing the
20   evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her
21   favor, the Court finds that Defendant Koetter's conduct amounted to affirmative conduct that
22   enhanced the danger to which J.K. was exposed.

23                    **ii.  Deliberate Indifference**

24          The Court must also decide whether the danger to which Koetter exposed J.K. was
25   known or obvious, and whether he acted with deliberate indifference to it.  Kennedy, 439
26   F.3d at 1064.  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that
27   a municipal actor disregarded a known or obvious consequence of his actions."  Bryan
28   County v. Brown, 520 U.S. 397, 410 (1997).  The Ninth Circuit does not require that "the

1   conscience of the federal judiciary be shocked by deliberate indifference," but instead

2   requires that the state actor acted deliberately and indifferently to the danger he or she was

3   creating.  Id. at 1064-65.  Again, the Court must look at the alleged facts in the light most

4   favorable to Plaintiff, the non-moving party.

5          There is little dispute that Coach Koetter knew about Henderson's misconduct during

6   the Summer Bridge program.  (Dkt. #192, p.10).  However, Koetter contends that the

7   evidence does not support a finding that he was deliberately indifferent because he supported

8   Steve Rippon's decision to remove Henderson from the Summer Bridge program (DSOF Ex.

9   6; PSOF Ex. I), he spoke to Henderson and told him that he needed to learn from his

10  mistakes (DSOF 53-54), and he thought that Henderson had "paid a price" for his

11  misbehavior by being kicked out of the Summer Bridge program (DSOF Ex. 5).  Plaintiff,

12  on the other hand, contends that Coach Koetter was deliberately indifferent to a known or

13  obvious danger that Henderson posed to J.K., because Koetter knew about Henderson's

14  misconduct during the Summer Bridge program, including the fact that Henderson sexually

15  harassed women, and nonetheless, in light of the fact that Henderson was one of only two

16  ASU Summer Bridge students – and the only football player – ever to be expelled in the 12-

17  year history of the Summer Bridge program, Koetter actively sought to ensure that

18  Henderson would return to ASU and failed to institute any sort of plan to monitor or ensure

19  that Henderson would not engage in such behavior again.  (Dkt. #182, pp. 11-13; PSOF ¶¶

20  11, 24-26, 29-33, 35, 47-50, 54-62).

21         Viewing the facts in the light most favorable to J.K., the Court finds that a reasonable

22  fact-finder could conclude that the evidence in the record, if accepted as true, is sufficient to

23  establish that Coach Koetter acted deliberately and indifferently to the danger he was

24  creating.  Henderson's misconduct during the Summer Bridge program was far from slight;

25  Henderson sexually intimidated and harassed women in his dormitory and he was the only

26  football player to ever be kicked out of the Summer Bridge program.  The evidence in the

27  record indicates that J.K. may be able to establish that in light of Henderson's egregious

28  misconduct, Coach Koetter nonetheless facilitated Henderson's return to ASU and ensured

1    his ability to join the ASU football team.  Also, despite his affirmative assurances that

2    Henderson would be placed on a "three strikes" or "zero tolerance" plan when he returned

3    to ASU, Koetter never put such a plan into effect.  Instead, he merely spoke to Henderson

4    and told him that he needed to learn from his mistakes, and thought that Henderson had

5    already "paid a price" for his misconduct by being kicked out of the Summer Bridge program

6    three weeks before it concluded.  Whether that is a sufficient explanation to support a finding

7    that Defendant Koetter's actions were objectively reasonable and not deliberately indifferent

8    is for the fact-finder.

9             **B.  Was the Right Violated Clearly Established?**

10         Even if the jury finds that Defendant Koetter's conduct affirmatively and with

11    deliberate indifference created or enhanced a known or obvious danger to J.K., Koetter is

12    entitled to qualified immunity if the right violated was not clearly established.  <u>Saucier</u>, 533

13    U.S. at 202.  "To determine whether a right is clearly established, the reviewing court must

14    consider whether a reasonable officer would recognize that his or her conduct violates that

15    right under the circumstances faced, and in light of the law that existed at that time."

16    <u>Kennedy</u>, 439 F.3d at 1065 (citing <u>Saucier</u>, 533 U.S. at 202).  Put another way, "the specific,

17    alleged conduct in this case need not have been previously and explicitly deemed

18    unconstitutional, but existing case law must have made it clear that the conduct violated

19    constitutional norms."  <u>Id.</u> at 1065-66.

20         As the Ninth Circuit held in <u>Kennedy</u>, "[i]t is beyond dispute that in 1998, it was

21    clearly established that a state official could be held liable where they affirmatively and with

22    deliberate indifference placed an individual in danger she would not otherwise have faced."

23    439 F.3d at 1066.  Liability for state-created danger was just as well beyond dispute in 2003,

24    as was Plaintiff's right to be free from student-on-student sexual harassment, <u>Reese v.</u>

25    <u>Jefferson School Dist. No. 14J</u>, 208 F.3d 736 (9th Cir. 2000).  As such, if the jury finds that

26    Coach Koetter's conduct amounted to a constitutional violation, i.e., that Koetter

27    affirmatively and with deliberate indifference placed J.K. in danger she would not otherwise

28    have faced, then the second prong of the qualified immunity analysis will not act to bar

1    Plaintiff's claim.  Plaintiff's right to not be affirmatively placed in danger by a state actor's

2    deliberate indifference to a known or obvious danger was clearly established in 2003.

3        **C.  Proximate Cause**

4        Defendant Koetter also contends that even if Plaintiff can establish that he acted

5    affirmatively and with deliberate indifference to a known or obvious danger, he can not be

6    held liable under § 1983 because the injury to J.K. was not foreseeable.  (Dkt. #163, p.5).

7    Relying on Martinez v. California, 444 U.S. 277 (1980), Coach Koetter contends that "there

8    is no proximate causality between Koetter's action or inaction and Henderson's sexual

9    assault of Plaintiff"; Defendant states that "[a]s in Martinez, Koetter could not have foreseen

10   that Plaintiff faced any special danger."  (Dkt. #163, pp. 5-6).

11       In Martinez v. California, the survivors of a murdered girl brought suit against a

12   parole board and its officials, claiming that the parole board was liable for the damages

13   caused by a parolee who murdered the deceased girl five months after his release from

14   prison.  444 U.S. at 279-80.  The Supreme Court dismissed Plaintiffs' § 1983 claims against

15   the parole board, holding that the allegations were too remote and therefore insufficient to

16   demonstrate that the parole board deprived the deceased of life within the meaning of the

17   Fourteenth Amendment.  Id. at 285.  The Court noted, however, that its holding was limited

18   to the particular circumstances of that case, where the parolee "was in no sense an agent of

19   the parole board . . . and was not aware that [the] decedent, as distinguished from the public

20   at large, faced any special danger."  Id. (citations omitted).  Based on that language, Koetter

21   argues that he can not be held liable because he did not know Plaintiff personally (Dkt. #163,

22   p.5), he did not know that "Plaintiff or anyone else faced a special danger," and Plaintiff's

23   sexual assault "was too remote a consequence of [his] alleged actions or inactions for him

24   to be held liable."  (Dkt. #192, pp. 6-9).

25       Plaintiff, on the other hand, responds that "the issue o[f] proximate cause is merely

26   a rephrasing of the requirement that the danger to the plaintiff must have been 'known or

27   obvious' and that state actor must have acted with deliberate indifference to the danger."

28   (Dkt. #182, p.16).  Moreover, Plaintiff states that "[i]n the case before the Court, Koetter

1   knew of Henderson's recent prior history, just months earlier, of [ ] sexual harassment.  It is
2   for the jury to determine whether Koetter's conduct in permitting Henderson to return to
3   ASU and the dorms, was a foreseeable, proximate cause of Plaintiff's injuries in light of his
4   knowledge."  (Id., pp. 15-16).

5           The Court agrees that the issue of proximate causation is part of the requirement that
6   the state actor left the plaintiff in a situation that was more dangerous than the one in which
7   he or she found him, i.e., that the state actor engaged in affirmative conduct that enhanced
8   the danger to the plaintiff.  In addition, the Court does not find the facts of Martinez to be
9   congruous with the facts of this case.  The Martinez court makes a point of basing its holding
10  on the fact that the victim faced no special danger *as opposed to the public at large*.  Here,
11  although Defendant Koetter contends that Plaintiff's argument that his actions created a risk
12  "to women in the dormitory" is analogous to alleging that his actions created a risk to the
13  public at large (Dkt. #192, p.8), the Court disagrees.  The female ASU students living in
14  Henderson's dormitory are not analogous to the public at large.  Henderson was one of only
15  two students in 12 years to have been kicked out of the Summer Bridge program, and he was
16  kicked out for, among other things, sexually harassing women.  Henderson was soon
17  thereafter allowed to return to ASU and live in the dormitories.  Clearly, women living in
18  Henderson's dormitory had been sexually harassed during the Summer Bridge program, and
19  thus women in the dormitories that Henderson lived in once he returned to ASU also faced
20  the possibility of being sexually harassed by Henderson.  A reasonable fact-finder could find
21  that Defendant Koetter's actions made foreseeable eventual harm to a discrete class of
22  victims, i.e., that Henderson might sexually harass or assault one or more female ASU
23  students living in Henderson's dormitory, which is in fact what eventually happened to J.K.
24  in March 2004.

25          In addition, as in Walter v. Pike County, Pennsylvania, Defendant Koetter "attempt[s]
26  to read a 'proximate-timing' component into the use of the word 'remote' in the Martinez
27  decision."  465 F.Supp.2d 409, 418 (M.D.Pa. 2006).  However, as the district court stated in
28  Walter, "'remote' is utilized [in Martinez] to speak of an effect that is distant in relationship

1    or connection, and was not intended to apply to a temporally-distant but causally-related

2    effect of an earlier action." Id. Indeed, as the Ninth Circuit stated in Ketchum v. Alameda

3    County, "[i]n discussing remoteness, the Court considered not only the lapse of time, but also

4    the fact that the decedent did not stand in any special relationship to the parolee from which

5    the state officers might have inferred a special danger to her, distinguishable from the danger

6    the public at large faces from parolees." 811 F.2d 1243, 1245 (9th Cir. 1987). Although

7    Plaintiff's rape occurred several months after Henderson returned to ASU after being kicked

8    out of the Summer Bridge program, as stated above, a reasonable fact-finder could find that

9    Plaintiff stood in a special relationship to Henderson. Based on the fact that Henderson

10   repeatedly sexually harassed women in his dormitory during the Summer Bridge program,

11   Coach Koetter could have inferred a danger to Plaintiff, distinguishable from the danger the

12   public at large faced, because Plaintiff was a female ASU student living in the same

13   dormitory as Henderson.[2] Although Coach Koetter is correct that "state officials do not

14

15       [2]This Court notes that "[i]n each Ninth Circuit case finding a state created danger
     existed, the state actor's direct contact with the victim affirmatively created the danger."
16   McKissen v. Leyendecker, 2007 WL 2900425, at *3 (E.D.Wash. 2007). However, this Court
     also recognizes, as established in the foregoing discussion, that there is an actionable
17   distinction between state-created dangers to the public at large and those dangers directed to
     a more discrete, identifiable class of plaintiffs. As such, this Court will not narrowly read
18   the state-created danger exception to require that state actors must have either specific
     contact with the victim or realize that his or her affirmative acts created harm to a specific
19   individual as opposed to a discrete group of individuals, any one of whom could identifiably
     be harmed by the state actor's conduct. The standard in state-created danger cases is that
20   "the state actor need only have created the *particularized risk* that plaintiff might suffer such
     injury", not that the state actor must be the cause-in-fact of the plaintiff's injury or have
21   created the risk to a particular plaintiff, as opposed to a discrete and identifiable class of
     plaintiffs. Kennedy, 439 F.3d at 1062 n.2 (emphasis added). Here, Henderson was expelled
22   from the Summer Bridge program and the dormitory in which he resided because of his
     ongoing misconduct, which included multiple incidents where he sexually harassed women
23   in the dormitory. Defendant Koetter allegedly then sought and facilitated Henderson's
     return to ASU, in addition to assuring that Henderson would be subject to a behavioral plan.
24   Henderson returned to ASU and was placed back in the on-campus dormitories without
     restrictions, and despite alleged misconduct by Henderson during the fall of 2003 and in
25   March 2004, no behavioral plan was ever implemented. Then, in March 2004, Henderson
26   sexually assaulted J.K., one of the female students in Henderson's dormitory. Based on these
27
28

1   violate due process rights, and hence are not liable under section 1983, for every injury in

2   which they play some casual role," Escamilla v. Santa Ana, 769 F.2d 266, 269 (9th Cir.

3   1986), whether the injury alleged here was a "fairly direct" result of Koetter's alleged

4   conduct, is a question for the fact-finder in determining whether Koetter affirmatively placed

5   Plaintiff in danger. Accordingly, the Court finds that Defendant Koetter fails to satisfy his

6   burden of proving that there is no genuine issue of material fact or reasonable inference that

7   can be drawn as it relates to this initial prong of the state-created danger analysis.

8          In sum, qualified immunity will not shield Coach Koetter if he is found to have

9   affirmatively placed J.K. in danger by acting with deliberate indifference to a known or

10  obvious danger posed by Henderson. The Court finds that there are genuine issues of

11  material fact for a jury to decide as to whether Koetter affirmatively placed J.K. in danger

12  that she otherwise would not have faced had Koetter not, among other things, allegedly

13  facilitated Henderson's unrestricted return to ASU after Henderson had been kicked out of

14  the 2003 Summer Bridge Program. The question of whether the injury alleged was a "fairly

15  direct" result of Koetter's alleged conduct is likewise a question for the jury. In addition,

16  viewing the facts in the light most favorable to J.K., the Court finds that there is sufficient

17  evidence to establish that Koetter may have acted with deliberate indifference to a known or

18  obvious danger. Whether Koetter's actions were instead objectively reasonable is a question

19  for the jury. Finally, the Court finds that the state-created danger exception was clearly

20  established during the relevant time period in this case.

21  **IV.    THE ASU DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

22         Defendants Arizona Board of Regents and Arizona State University (collectively, "the

23  ASU Defendants") move the Court for summary judgment on Plaintiff's claims brought

24  under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, et seq.

25  The ASU Defendants contend that ASU was not deliberately indifferent to either Defendant

26

27  facts, the Court must reject Koetter's argument that there are no triable issues of fact
    regarding whether J.K. was an identifiable victim, and whether her rape was too remote a
28  consequence of Koetter's alleged conduct in facilitating Henderson's return to ASU.

1    Henderson's sexual assault of J.K. in March 2004 or Henderson's sexual harassment of

2    women during the 2003 Summer Bridge program.  (Dkt. #162, pp. 5-6).  To the contrary, the

3    ASU Defendants argue that ASU responded reasonably to both Plaintiff's rape and

4    Henderson's misconduct during the Summer Bridge program.  (Id., pp. 6-8).  The ASU

5    Defendants also state that ASU took reasonable steps to prevent sexual harassment on the

6    ASU campus in general.  (Id., p.8).  Plaintiff and *Amici Curiae* oppose the ASU Defendants'

7    motion for summary judgment, contending that "there are abundant factual issues regarding

8    ASU's deliberate indifference to the known risk of sexual harassment posed by Defendant

9    Darnel Henderson."  (Dkt. #177, p.2).

10          Title IX provides that "[n]o person in the United States shall, on the basis of sex, be

11   excluded from participation in, be denied the benefits of, or be subjected to discrimination

12   under any education program or activity receiving Federal financial assistance."  20 U.S.C.

13   § 1681(a).  The parties do not dispute that the ASU Defendants are recipients of federal

14   education funds for purpose of Title IX.

15          In Davis v. Monroe County Board of Education, the Supreme Court concluded that

16   the "recipients [of federal educational funds] may be liable for their deliberate indifference

17   to known acts of peer sexual harassment."  526 U.S. 629, 648 (1999).  Applying Davis, the

18   Ninth Circuit "set forth four requirements for the imposition of school district liability under

19   Title IX for student-on-student harassment."  Reese v. Jefferson School Dist. No. 14J, 208

20   F.3d 736, 739 (9th Cir. 2000).  First, the funding recipient must exercise substantial control

21   over both the harasser and the context in which the harassment occurs.  Id. (citing Davis, 526

22   U.S. at 644).  Second, the victim's sexual harassment must be so severe, pervasive, and

23   objectively offensive that it deprives the victim of access to educational opportunities or

24   benefits provided by the school.  Id. (citing Davis, 526 U.S. at 650).  Third, the funding

25   recipient must have actual knowledge of the harassment.  Id. (citing Davis, 526 U.S. at 644,

26   649-50).  Fourth, the funding recipient must have acted with deliberate indifference to the

27   known harassment.  Id. (citing Davis, 526 U.S. at 644-45).  "That is, the deliberate

28

1   indifference must, at a minimum, cause students to undergo harassment or make them liable

2   or vulnerable to it." Davis, 526 U.S. at 645 (quotations omitted).

3        The first and second requirements are undisputed here: (1) ASU exercised substantial

4   control over ASU student Darnel Henderson and the ASU dormitory in which the alleged

5   harassment took place; and (2) Henderson's alleged rape of Plaintiff, as well as his alleged

6   sexual harassment during the Summer Bridge program, constitutes "severe, pervasive, and

7   objectively offensive" sexual harassment that deprived Plaintiff of the equal access to

8   education that Title IX is designed to protect. See Davis, 526 U.S. at 621-52 ("Damages are

9   not available for simple acts of teasing and name-calling among school children, however,

10  even where these comments target differences in gender."); see also Soper v. Hoben, 195

11  F.3d 845, 855 (6th Cir. 1999) (stating that rape "obviously qualified as being severe,

12  pervasive, and objectively offensive sexual harassment that could deprive [the victim] of

13  access to the educational opportunities provided by her school"). However, the parties

14  dispute the remaining requirements, i.e., whether ASU was "deliberately indifferent to sexual

15  harassment of which [it had] actual knowledge" in such a way as to "cause the plaintiff to

16  undergo harassment or make [her] liable or vulnerable to it." Davis, 526 U.S. at 644-45, 650.

17       **A.   Actual Knowledge**

18       In order for a funding recipient to be subject to Title IX liability, "an official 'who at

19  a minimum has authority to address the alleged discrimination and to institute corrective

20  measures on the recipient's behalf [must have] actual knowledge of discrimination.'" Reese,

21  208 F.3d at 739 (quoting Gebser v. Lago Vista Indep. School Dist., 524 U.S. 274, 290

22  (1998)). The funding recipient must have "some control" over the alleged harassment; "[a]

23  recipient cannot be directly liable for its indifference where it lacks the authority to take

24  remedial action." Davis, 526 U.S. at 644. Indeed, the "harassment must take place in a

25  context subject to the [recipient's] control." Id. at 645.

26       The ASU Defendants contend that "none of the persons who may be said to have had

27  notice of the alleged prior harassment by Henderson had authority to take any more action

28  than they did." (Dkt. #162, p.7). However, the ASU Defendants also stated, in their

response to the Amici Curiae brief, that "it is undisputed that ASU did take action in response to Henderson's bad behavior in the Summer Bridge program," and that "[b]ased on the record in this case, no one can say that ASU learned of a problem and did nothing." (Dkt. #222, p.6). As such, it appears that the ASU Defendants acknowledge that ASU had actual knowledge of the alleged harassment, both with respect to Plaintiff's sexual assault and the harassment that occurred during the Summer Bridge program.

The record clearly establishes that ASU officials who had authority to address Henderson's alleged sexual harassment and institute corrective measures on ASU's behalf did in fact have actual knowledge of Henderson's alleged harassment. It is undisputed that Steve Rippon, ASU's Executive Director of Academic Success and Director of the 2003 Summer Bridge program, knew of the allegations of Henderson's sexual harassment. (Dkt. #163, p.3; Dkt. #181, p.3; PSOF 24-26). Indeed, Rippon took corrective measures on ASU's behalf by kicking Henderson out of the Summer Bridge program for ongoing misconduct, which included sexual harassment. (Dkt. #222, p.6; DSOF 51). Further, it is undisputed that Rippon had the authority, and apparently the obligation, to report Henderson's conduct to Judicial Affairs for possible Code of Conduct violations. As stated by Sandra Hatfield-Clubb, ASU's Senior Associate Athletic Director and Title IX coordinator, "[i]t is absolutely . . . . the responsibility of any university official to report [such] inappropriate conduct to judicial affairs." (PSOF ¶¶ 44, 45). Rippon clearly had control over Henderson's alleged harassment, as well as the authority to take remedial action on ASU's behalf. These facts alone are enough to satisfy the actual knowledge requirement for Title IX liability.

In addition, the record establishes that Defendant Koetter, the head coach of ASU's football team, knew of Henderson's misconduct and expulsion from the Summer Bridge program. (DSOF ¶¶ 53-54; DSOF Ex. 5; PSOF Ex. I). Like Rippon, Koetter also had the authority and "responsibility" to report Henderson's conduct to Judicial Affairs. (PSOF ¶¶ 44, 45). Further, the record establishes that Coach Koetter had the authority to institute corrective measures on ASU's behalf in relation to Henderson's misconduct during the Summer Bridge program. (PSOF ¶¶ 47-49; DSOF ¶¶ 57, 60). Indeed, Henderson was

1   supposed to have only been able to return to ASU and rejoin the football team subject to a

2   "three strikes" or "zero tolerance" plan, which certainly constitutes a corrective measure.

3   (Id.).  As such, the Court finds that the record establishes that the ASU officials who had the

4   authority to address Henderson's alleged harassment during the 2003 Summer Bridge

5   Program, had both the authority to institute corrective measures on ASU's behalf and had

6   actual knowledge of Henderson's harassment.

7          Regardless, the ASU Defendants argue that the Court should not consider

8   Henderson's alleged harassment during the 2003 Summer Bridge Program because "Davis

9   should not be extended to recognize a claim premised on alleged deliberate indifference to

10  prior harassment" of victims other than the plaintiff.   (Dkt. #162, p.7).   This Court

11  fundamentally disagrees with the contention that premising a Title IX claim "on the alleged

12  deliberate indifference to prior harassment of others" is an extension of the Supreme Court's

13  holding in Davis.  The Davis court did not limit Title IX liability to a federal education

14  funding recipient's knowledge of, and deliberate indifference to, the alleged harassment of

15  *a particular individual*, but instead contemplated that Title IX claims could be based on the

16  recipient's knowledge of, and deliberate indifference to, a *particular harasser's* conduct in

17  general.  526 U.S. at 644, 645 (focusing the Title IX inquiry on the harasser and the context

18  in which the known harassment occurs, because "[o]nly then can the recipient be said to

19  'expose' its *students* to harassment or 'cause' them to undergo it 'under' the recipient's

20  programs") (emphasis added).  The ASU Defendants' interpretation of Davis places an

21  improper limitation on Title IX liability as contemplated in Davis, because it places the focus

22  of the inquiry on a particular victim of sexual harassment, rather than the conduct of the

23  harasser and the funding recipient's knowledge of, and control over, the harasser.  The

24  Supreme Court made clear in Davis that the focus of Title IX liability lies on the conduct of

25  the harasser, not the victim, and the funding recipient's knowledge of harassment and control

26  over the harasser and the context in which the harassment occurs.  Id. at 645.

27         Although the Ninth Circuit has not weighed in on this issue, the Court is buyoued in

28  its conclusion by the decisions of the vast majority of courts that have.  See, e.g., Williams

1  v. Board of Regents of the University System of Georgia, 447 F.3d 1282, 1293 (11th Cir.

2  2007) (finding that the defendants' "preexisting knowledge of [the harasser]'s past sexual

3  misconduct" – committed against people other than the plaintiff – "[wa]s relevant when

4  determining" whether the plaintiff had stated a claim under Title IX); Escue v. Northern

5  Oklahoma College, 450 F.3d 1146, 1153 (10th Cir. 2006) (stating that because "actual

6  knowledge of discrimination in the recipient's program is sufficient, . . . harassment of

7  persons other than the plaintiff may provide the school with the requisite notice to impose

8  liability under Title IX"); Delgado v. Stegall, 367 F.3d 668, 672 (7th Cir. 2004) (recognizing

9  that, "in Davis the Court required knowledge only of 'acts of sexual harassment' by the

10 [harasser], . . . not of previous acts directed against the particular plaintiff"); Michelle M. v.

11 Dunsmuir Joints Union School Dist., 2006 WL 2927485, at *6 (denying summary judgement

12 "[i]n view of defendants' knowledge of [plaintiff's harasser's] prior behavoir"); Doe A. v.

13 Green, 298 F.Supp2d 1025, 1033-34 (D.Nev. 2004) (finding that liability could be based on

14 "actual knowledge of a substantial risk of abuse to students based on prior complaints by

15 other students"); Johnson v. Galen Health Institutes, Inc., 267 F.Supp.2d 679, 688 (W.D.Ky.

16 2003) ("[T]he actual notice standard is met when an appropriate official has actual

17 knowledge of a substantial risk of abuse to students based on prior complaints by other

18 students."). As such, the Court finds that the proper inquiry under Title IX is whether ASU's

19 response to Henderson's alleged sexual harassment in general, i.e., to other students as well

20 as J.K., was "clearly unreasonable" in light of known circumstances.

21        **B.  Deliberate Indifference**

22        "[F]unding recipients are deemed 'deliberatively indifferent' to acts of student-on-

23 student harassment only where the recipient's response to the harassment or lack thereof is

24 *clearly unreasonable* in light of the known circumstances."   Davis, 526 U.S. at 648

25 (emphasis added).  If a funding recipient "takes timely and reasonable measures to end the

26 harassment, it is not liable under Title IX for prior harassment."  Wills v. Brown University,

27 184 F.3d 20, 26 (1st Cir. 1999) (citing Gebser, 524 U.S. at 291-92); see Davis, 526 U.S. at

28 649 (stating that courts must continue to "refrain from second-guessing the disciplinary

1   decisions made by school administrators"). "If, on the other hand, an institution either fails

2   to act, or acts in a way which could not have reasonably been expected to remedy the

3   violation, then the institution is liable for what amounts to an official decision not to end

4   discrimination." Doe A., 298 F.Supp.2d at 1035.

5       The ASU Defendants contend that ASU's reaction to J.K.'s alleged rape, in addition

6   to the complaints of harassment by multiple women during the Summer Bridge program, was

7   not clearly unreasonable. (Dkt. #194, p.7). Specifically, the ASU Defendants argue that

8   "[t]he evidence shows that Judicial Affairs investigated the [rape] allegation against

9   Henderson, determined that he violated the Student Code of Conduct, and expelled him from

10  [ ] ASU in approximately two months. (DSOF 106-07, 110-12). That can hardly be

11  considered unreasonable." (Dkt. #194, p.4; see also Dkt. #162, p.6). In addition, the ASU

12  Defendants argue that "[t]he actions taken in response to the prior harassment – kicking

13  [Henderson] out of Summer Bridge – were sufficient under Title IX." (Dkt. #162, p.7).

14      Plaintiff, on the other hand, contends that ASU's responses to both her rape and

15  Henderson's conduct during the Summer Bridge program were clearly unreasonable in light

16  of the circumstances. (Dkt. #177, pp. 13-15). Plaintiff points to evidence in the record that

17  shows, among other things, that (1) although Steve Rippon eventually expelled Henderson

18  from the Summer Bridge program, neither he nor Defendant Koetter reported Henderson's

19  misconduct to Judicial Affairs (PSOF ¶¶ 39, 44-45, 137-38, 163; PSSOF ¶¶ 86, 89); (2)

20  Coach Koetter affirmatively facilitated Henderson's return to ASU and sought Henderson's

21  placement on the football team (PSOF ¶¶ 30-34; PSSOF ¶15); (3) when Henderson returned

22  to ASU just weeks after his expulsion, he was allowed to reside in the on-campus dormitories

23  (PSSOF ¶40); (4) although Koetter asserted that Henderson would be subject to a "three-

24  strikes" or "zero tolerance" plan upon his return to ASU, such a plan was never enforced

25  (PSOF ¶¶ 47-50; PSSOF ¶19); (5) Henderson was allowed to remain on the football team and

26  in the same dormitory for three weeks after he allegedly raped J.K. (PSSOF ¶¶ 80-81); and

27  (6) Henderson was allowed to complete the his spring semester before being expelled from

28  ASU (PSSOF ¶¶ 74-76).

1    Both parties spend a good deal of time and effort attempting to draw factual

2  distinctions and comparisons between the instant case and others in an attempt to support

3  their contentions as to whether ASU's conduct constitutes deliberate indifference. (See Dkt.

4  #194, pp. 4-6; Dkt. #177, pp. 10-11, 13-16; Dkt. #220, pp. 5-7, 10-12; Dkt. #222, pp. 7, 9-

5  12).  However, those cases merely outline the boundaries of what may or may not constitute

6  "deliberate indifference," indicating the sorts of circumstances under which a court may rule

7  that a particular response was or was not "clearly unreasonable" as a matter of law; they do

8  not offer a bright-line determination regarding what constitutes a "clearly unreasonable"

9  response to known harassment or discrimination in violation of Title IX.  As mentioned

10 above, to determine whether a particular response is deliberately indifferent, the court must

11 ask whether that response was clearly unreasonable in light of the known circumstances to

12 remedy the violation that had occurred.  Here, ASU did not wholly fail to act in response to

13 Henderson's known misconduct; Steve Rippon kicked Henderson out of the Summer Bridge

14 program, and ASU immediately began an investigation after J.K. alleged that Henderson had

15 raped her, concluding in Henderson's permanent expulsion from ASU.  As such, the question

16 is whether those responses "could not have reasonably been expected to remedy the

17 violation," i.e., whether ASU's response was "clearly unreasonable."  In light of the known

18 circumstances of Henderson's conduct during the Summer Bridge program, the Court can

19 not find as a matter of law that ASU's response was not clearly unreasonable.

20    As the Doe A. court noted, the question of whether an institution acted with deliberate

21 indifference under a particular set of circumstances is a question normally left to the jury.

22 298 F.Supp.2d at 1036 (citing, e.g., Oviatt By and Through Waugh v. Pearce, 954 F.3d 1470,

23 1478 (9th Cir. 1992) ("Whether a local government entity has displayed a policy of deliberate

24 indifference is generally a question for the jury."); Davis v. Mason County, 927 F.2d 1473,

25 1482 (9th Cir. 1991); Alexander v. City and County of San Francisco, 29 F.3d 1355, 1367

26 (9th Cir. 1994); Blair v. City of Pomona, 206 F.3d 938, 2000 WL 290246, at *5 (9th Cir.

27 2000); Lee v. City of Los Angeles, 250 F.3d 668, 681 (9th Cir. 2001); and Perrin v. Gentner,

28 177 F.Supp.2d 1115, 1124 (D.Nev. 2001)).  In addition, a number of "[o]ther district courts

1    have found that the deliberate indifference or clearly unreasonable standard 'does not lend

2    itself well to a determination by the Court on summary judgment,' and have permitted the

3    claim to go to the jury if the plaintiff advanced some evidence in support." Id. (citing Hart

4    v. Paint Valley, 2002 WL 31951264, at *4 (S.D.Ohio 2002) (stating that whether a response

5    is unreasonable under Title IX "does not lend itself well to a determination by the Court on

6    summary judgment")); Theno v. Tonganoxie Unif. Sch. Dist. No. 464, 394 F.Supp.2d 1299,

7    1311-12 (D.Kan. 2005) (finding that whether the school responded adequately to known acts

8    of harassment was an issue of fact for the jury to decide at trial).  This Court agrees.  If

9    Plaintiff is able to assert some compelling evidence in support of her claim that ASU's

10   response to Henderson's known harassment was unreasonable, then the determination of

11   whether ASU's response was *clearly* unreasonable in light of the known circumstances

12   should be left to the fact-finder.

13          In light of the totality of the circumstances, and considering the facts in the light most

14   favorable to the Plaintiff, the Court can not hold as a matter of law that ASU's response to

15   Henderson's known misconduct during the Summer Bridge program, as well as J.K.'s

16   allegation that Henderson raped her, were not "clearly unreasonable."  Although Steve

17   Rippon expelled Henderson from the Summer Bridge program because of Henderson's

18   misconduct, Plaintiff may nonetheless be able to prove that the ASU Defendants "subjected"

19   her to harassment when ASU not only allowed Henderson to return, but Coach Koetter

20   affirmatively facilitated his return, and Henderson was placed back in the on-campus

21   dormitories with no restrictions or specialized monitoring.  In addition, Plaintiff may be able

22   to prove that ASU's response to her alleged rape was "clearly unreasonable" in light of,

23   among other things, the fact that ASU allowed Henderson to remain in the same dormitory

24   for three weeks after ASU police were notified that Henderson had raped J.K., a female

25   student in Henderson's dormitory.  Accordingly, the Court finds that the ASU Defendants

26   have not provided sufficient evidence to either negate an essential element of J.K.'s claims

27   or show that J.K. does not have sufficient evidence to carry her ultimate burden of persuasion

28   at trial.    Whether Plaintiff can ultimately prove that ASU's responses were clearly

1  unreasonable in light of the known circumstances are questions that must be resolved by the

2  jury.

3          **Accordingly,**

4          **IT IS HEREBY ORDERED** that Defendant Koetter's motion for summary judgment

5  (Dkt. #163) is DENIED.

6          **IT IS FURTHER ORDERED** that the ASU Defendant's motion for summary

7  judgment (Dkt. #162) is DENIED.

8          **IT IS FURTHER ORDERED** with respect to the Court's August 5, 2008 order that

9  Plaintiff has leave to depose the ASU Defendants' late-disclosed witnesses, that Plaintiff

10  must depose, if deemed necessary, the witnesses listed in the ASU Defendants' August 30,

11  2007 Fourth Supplemental Disclosure Statement by October 31, 2008.

12          DATED this 29th day of September, 2008.

13

14

15

16          _____
            Mary H. Murgula
17          United States District Judge

18

19

20

21

22

23

24

25

26

27

28